IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS M. HODCZAK; JAMES M. CROSSMAN; THOMAS J. MAGDIC; JOSEPH A. LITVIK, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 08-649 Judge Terrence F. McVerry |
| LATROBE SPECIALTY STEEL COMPANY, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

McVerry, District Court Judge

Plaintiffs, Douglas M. Hodczak ("Hodczak"), James M. Crossan ("Crossan"), Thomas J. Magdic ("Magdic") and Joseph A. Litvik ("Litvik") (collectively, "plaintiffs"), commenced this action under the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621 *et seq*, alleging that defendant Latrobe Specialty Steel Company ("LSS"), discriminated against them because of their age when it terminated their employment in November of 2007, and not, as LSS contends, for sending sexually explicit emails in violation of LSS' Electronic Communications Policy ("EC Policy").

A.    Factual and Procedural Background

It is undisputed that all four plaintiffs were hired by LSS' predecessor, Latrobe Steel Company, between 1969 and 1979.   (ECF 135-2, ¶ 2).   In 1975, Latrobe Steel Company was subsequently acquired by the Timken Company and, in 2006, Timken Latrobe Steel ("Timken")

was acquired by the Watermill Group and Hicks Holdings and renamed LSS. (ECF 1, ¶¶ 15, 17). At some time prior to the last change of ownership, Timken Latrobe Steel gave a number of employees, including plaintiffs, the opportunity to retire before the acquisition took place. Although plaintiffs chose to retire from Timken, they were subsequently offered and accepted employment with LSS on December 9, 2006. (ECF 21, ¶¶ 3-5; ECF 26, ¶¶ 3-5; ECF 17, ¶ 6; ECF 27, ¶ 6).

In the fall of 2007, pictures taken at a going away party for an LSS intern were posted on LSS' intranet site. One picture was that of an LSS employee, Melissa Jespersen ("Jespersen"), wearing a v-neck shirt revealing her cleavage. (ECF 135-4, pp. 11, 48; ECF 135-7, p. 8; ECF 172-3, pp. 11-12). On October 5, 2007, Magdic saw the picture and sent an email to Jespersen, with the picture attached and the phrase "Pretty nice!" in the subject line. (ECF 135-7, pp. 7-8; ECF 135-4, p. 11; ECF 172-3, pp. 11-12). Ms. Jespersen apparently found the email offensive and, on Monday, October 29, 2007, made a complaint to Susan Lawson ("Lawson"), LSS' Manager of Human Resources and Benefits Administration. According to Lawson, Jespersen also told her that she was uncomfortable being around Magdic because of comments he made to her after sending the picture to her and that she did not want to be alone with him. (ECF 135-9, pp. 18-19, 21, 22-23; ECF 135-6, pp. 6, 7). Lawson conveyed Jespersen's complaint to Dan Hennessy ("Hennessy"), LSS' Vice President of Manufacturing and Magdic's boss, and discussed investigating Magdic's emails to see if he had, in fact, sent the email at issue. (ECF 135-9, pp. 21, 23-24; ECF 135-6, pp. 7-9). John Katic (Katic"), the Principal Application Analyst in the IT Department, subsequently checked Magdic's email files at Lawson's request and, although he did

not find a copy of the email Magdic sent to Jespersen, he did find the photograph of her in

Magdic's computer as well as several other "questionable" items that he described as "a bit sexual

in nature." (ECF 135-9, pp. 24, 25; ECF 135-7, pp. 3, 5, 6). Lawson then reviewed those emails

from which she could see that Hodczak, Litvik, and Thomas Everett ("Everett") were sending

emails back and forth, some of which contained the sexually explicit photographs discovered by

Katic. Further examination of the email accounts of those individuals revealed that Crossan and

David Conrad ("Conrad") had also sent sexually oriented emails. (ECF 135-9, pp. 10, 26-28;

ECF 135-6, pp. 10-12; ECF 135-12, pp. 3-4, 5-7, 8-11). LSS consequently began to monitor the

email traffic of Hodczak, Crossan, Magdic, Litvik, Everett and Conrad over the next few days.

(ECF 172-6, pp. 31-32; ECF 172-37).

    As a result of LSS' probe, Lawson, Hennessy, Kevin Brahaney ("Brahaney"), Director of

Human Resources, and Mark Weberding ("Weberding"), LSS' Vice President of Marketing and

Sales, made the decision to preliminarily suspend all six employees and, on Friday, November 2,

2007, each one was called to the Human Resources Department and informed that he was being

suspended for violating the company's EC Policy. (ECF 135-9, pp. 29-31; ECF 135-2, ¶ 13).

     During the course of the next week, the process of determining the level of discipline that

would ultimately be imposed on each of the suspended employees was made. Lawson and

Hennessy testified that the focus was on the nature of the emails, the volume of emails, whether

they were sent to others inside the company or outside the company, and whether they were sent to

customers or vendors. (ECF 135-9, pp. 13-14; ECF 172-38; ECF 172-16, p. 20). Thereafter, on

or about November 8, 2007, plaintiffs were informed that their employment was being terminated

for the reasons articulated at the time of their suspension. (ECF 1, ¶¶ 20, 34, 48, 61; ECF 11, ¶¶ 20, 34, 48, 61; ECF 21, ¶ 12; ECF 26, ¶ 12; ECF 17, ¶ 7; ECF 27, ¶ 7). Neither Everett nor Conrad, however, was terminated.

Plaintiffs filed the instant complaint on May 13, 2008, which sets forth two claims of disparate treatment under the ADEA, alleging that LSS's stated reasons for terminating their employment are pretext for age discrimination and that their termination was part of a "systematic pattern and practice of terminating older employees." (ECF 1, ¶¶ 22, 26, 35, 40, 49, 54, 63, 67). On June 16, 2008, plaintiffs moved to voluntarily dismiss the disparate impact claim brought at Count II which was granted by the Court on June 17, 2008.[1] (ECF 14).

LSS has now filed a motion for summary judgment arguing that plaintiffs are unable to show that they were terminated because of their age.

B.    Standard of Review

Summary judgment is warranted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See Conoshenti v. Public Service Electric & Gas Company, 364 F.3d 135, 140 (3d Cir. 2004). When the moving party has met this burden, the burden then shifts to the nonmoving party to "set forth

---

[1]It should also be noted that although the complaint was filed as a "Collective Action Complaint" brought on behalf of plaintiffs "and all others similarly situated," plaintiffs have since advised the Court that they are no longer pursuing such collective claims.

specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (2). The mere

existence of some evidence favoring the non-moving party, however, will not defeat the motion.

There must be enough evidence with respect to a particular issue to enable a reasonable jury to find

in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). See

McGreevy v. Stroup, 413 F.3d 359, 363-64 (3d Cir. 2005). In evaluating the evidence at the

summary judgment stage, the court must view the facts in the light most favorable to the

non-moving party and draw all reasonable inferences in its favor. Matreale v. New Jersey Dept.

of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007).

    C.    Discussion

    LSS contends that it is entitled to summary judgment on plaintiffs' ADEA claims because

plaintiffs are unable to point to any evidence that age was determinative factor in its decision to

terminate their employment.

    Where, as here, the plaintiff seeks to prove his or her case through circumstantial evidence,

the three-stage shifting burdens of proof developed for employment discrimination cases in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies. Under the McDonnell

Douglas framework, the plaintiff has the initial burden of establishing a *prima facie* case of

discrimination which, under the ADEA, requires the plaintiff to demonstrate that: 1) he was a

member of the protected age class; 2) that he was qualified to hold the position; 3) that he suffered

an adverse employment decision; and 4) that he was replaced by a significantly younger

individual. Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995). "Once

the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a

legitimate non-discriminatory reason for the adverse employment action.   If the employer articulates such a reason, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination." Smith v. City of Allentown, 589 F.3d 684, 689-90 (3d Cir. 2009) ("Smith").   At all times, however, the burden of persuasion remains with the plaintiff.   Id.

Here, with the exception of Hodczak, LSS appears to concede that plaintiffs have established a *prima facie* case of discrimination.   Thus, the burden of production shifts to LSS to identify a legitimate, non-discriminatory reason for its employment decisions.

LSS contends that its decision to terminate plaintiffs was based on the fact that plaintiffs, who were all management level employees, had repeatedly sent sexually oriented and pornographic emails through LSS' email system to other employees as well as outside third parties which violated LLS' EC Policy.   Plaintiffs have conceded that LSS' articulated reason is age-neutral on its face and, therefore, that LSS has met its burden.   As such, the burden shifts back to plaintiffs to establish that LSS' proffered reason was pretext for age discrimination.   Smith, 589 F.3d at 690.

Plaintiffs may meet this burden by introducing evidence from which a fact finder could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.   Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) ("Fuentes").

Moreover, the United States Supreme Court has recently found that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was

the 'reason' that the employer decided to act." Gross v. FBL Financial Services, Inc., ___ U.S. ___, ___, 129 S. Ct. 2343, 2350 (2009) ("Gross"), citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993). See 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer … to discharge any individual … because of such individual's age"). Thus, in order to demonstrate pretext under Fuentes, it is incumbent upon the plaintiff to demonstrate that age was a determinative factor or "the 'but-for' cause of the employer's adverse decision;" it is not sufficient to simply show that age was "a motivating factor." Gross, 129 S. Ct. at 2349. See Smith, 589 F.3d at 691. See also Anderson v. Equitable Resources, Inc., 2009 WL 4730230 at *14 (W.D. Pa. Dec. 4, 2009) ("to show pretext at this stage [plaintiff] must proffer sufficient evidence for a reasonable jury to find that … the Defendant's proffered reasons would not have resulted in his termination absent improper consideration of age").

Here, plaintiffs argue that there is sufficient evidence from which a fact finder could reasonably conclude that that age was more likely than not a determinative factor in their respective terminations thereby demonstrating pretext under the second method articulated in Fuentes.[2] Plaintiffs can meet this burden by proving that LSS either: (1) "previously discriminated against [him]," (2) "discriminated against other persons within the [P]laintiff's protected class or within another protected class," or (3) treated similarly situated individuals outside the protected class more favorably than Plaintiff. Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998), citing Fuentes, 32 F.3d at 765. Plaintiffs' arguments in this regard will be addressed *seriatim*.

---

2 Although LSS also argued that plaintiffs are unable to show pretext under the first Fuentes prong, plaintiffs have not addressed LSS' argument in this regard and, thus, have seemingly conceded the issue.

Plaintiffs first challenge LSS' reliance on the EC Policy as a basis for their termination arguing that it was not in effect at the time as evidenced by the fact that the EC Policy was that of Timken, LSS' predecessor, and not LSS. Citing to their own testimony, plaintiffs contend that after the sale they were told by Hans Sack ("Sack"), the President and CEO of LSS, that they were no longer subject to Timken's rules and that LSS' own policies were being formulated. Because there is no evidence that Timken's policies had been adopted or that a new handbook had been issued, plaintiffs argue that it was not unreasonable for them to rely upon Sack's representations.

Plaintiffs' argument is without merit. Indeed, plaintiffs appears to argue that because it was reasonable for them to rely on Sack's alleged statements that they were no longer subject to Timken's rules and policies, it was somehow permissible to send sexually charged emails using LSS' email system. It is simply ridiculous, however, that plaintiffs, who were all management level employees who had been subject to a commonplace policy against sending sexually explicit emails under Timken's management, would think that such conduct would be countenanced by LSS simply because it had not yet issued a new handbook formally informing plaintiffs that, under *its* management, sending sexually explicit emails would not be tolerated. Indeed, sending sexually explicit materials on a work computer would appear to be a legitimate, nondiscriminatory ground for an adverse employment action notwithstanding whether or not a specific policy was in place. See Lugo v. Shinseki, 2010 WL 1993065 at *14 (S.D.N.Y. May 19, 2010). See also Pacenza v. IBM Corp., 2009 WL 890060 at *12 (S.D.N.Y. Apr. 2, 2009), aff'd, 363 Fed. Appx. 128 (2d Cir. Feb. 2, 2010). As such, the fact that there may have been a lapse between policies does not render LSS' reason for terminating plaintiffs' employment pretextual.

Plaintiffs next argue that they are able to demonstrate pretext because Carl Dorsch, Robert Smith and David Conrad, who were all younger employees, also violated the EC Policy and were treated more favorably. LSS, however, contends that these employees were not similarly situated to plaintiffs and, therefore, the fact that they may have been treated differently does not serve to show that plaintiffs were terminated because of their ages.

It is undisputed that "[a] plaintiff alleging employment discrimination may challenge the employer's proffered explanation by showing 'that the employer treated other, similarly situated persons out of his protected class more favorably….'" Ansell v. Green Acres Contracting Co., 347 F.3d 515, 521 (3d Cir. 2003), quoting Fuentes, 32 F.3d at 765.

> In order for employees to be deemed similarly situated, it has been determined that the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002), quoting Morris v. G.E. Financial Assurance Holdings, 2001 WL 1558039 at *6 (E.D. Pa. Dec. 3, 2001). See Nguyen v. AK Steel Corp., ___ F. Supp. 2d ___, ___, 2010 WL 3398948 at *15 (W.D. Pa. Aug. 25, 2010).

Plaintiffs submit that Carl Dorsch, who was a metallurgical engineer hired by Timken in 1997, was reprimanded twice, once in 1998 and again in 1999, before he was finally terminated in 2003, for accessing pornographic websites on his company computer. (ECF 172-18 through 172-25). Because Dorsch received two warnings before he was terminated for violating company policy, and plaintiffs were terminated without any warnings at all, plaintiffs contend that Dorsch was treated more favorably.

LSS, however, has amply demonstrated that Dorsch was not similarly situated to plaintiffs

and, thus, is not a proper comparator.   Unlike plaintiffs, Dorsch was a nonsupervisory employee

and was discharged by LSS' predecessor, Timken, five years earlier.   Further, the individuals who

made the decision to first reprimand and then terminate Dorsch's employment were Scott Balliett

and Mary Ann Watt, who were not the decision makers in plaintiffs' case, and Dorsch was

terminated for visiting pornographic websites not for sending sexually explicit emails.   (ECF

172-25).   Moreover, there is no evidence that Dorsch sent or forwarded the content of the

websites to anyone as did plaintiffs.   Thus, the fact that Dorsch was 47 years old when he was

terminated is of no moment.

   Similarly, Robert Smith was not comparably situated.   Although Smith was a manager at

LSS there is no evidence that he sent sexually explicit emails or, for that matter, any emails at all.

Rather, it appears that Smith's infraction was to allow a subordinate, Connie Fry, to borrow an

LSS' digital camera for a "family function" and to subsequently use his computer, which had the

necessary software on it, to download the photos she had taken and email them to her home.

(ECF 172-6, pp. 12-13).   Although the photographs turned out to be pictures of Fry and her

husband engaging in various sexual acts, there is no evidence that Smith sent them or knew the

content of the photos Fry had downloaded.   While plaintiffs categorize Smith's explanation of the

events as a "tale" woven for his supervisor which even Lawson had doubts about, and suggest that

it was actually Smith in the photos with Fry, it appears that it is plaintiffs who have woven the tale.

Not only have they utterly failed to provide any support for their insinuation that Smith is in the

photographs but review of the record demonstrates that although Lawson had some doubts upon

hearing Smith's explanation, both Fry and her husband subsequently verified Smith's version of

events, in fact "duplicated [his] story identically," which clearly assuaged those doubts.   (ECF

172-6, pp. 12-13).   Indeed, although noticeably omitted from their argument, plaintiffs

acknowledge in their counterstatement of facts that Smith's story was verified by Fry. (ECF 171, ¶ 130). Thus, not only did Smith not send any sexually explicit emails but he was reprimanded only for allowing an employee to use the company's electronic equipment on one occasion. As such, he was not similarly situated to plaintiffs and the fact that he was 46 years old at the time does nothing to further plaintiffs' position.

Finally, plaintiffs argue that Conrad, who was 37 years old when he was suspended along with plaintiffs for sending sexually explicit emails, was treated more favorably because he was not terminated. The record demonstrates, however, that although Conrad had been *receiving* sexually explicit emails for six months, he only *sent* one email several weeks before his suspension which was sent was to his supervisor, Litvik, at Litvik's request.[3] Moreover, unlike plaintiffs, Conrad did not send the email from his work computer but did so from his personal computer on personal time. (ECF 172-13, pp. 8, 15-19, 21, 24; ECF 135-5, pp. 18-19, 43-44). Thus, Conrad's position and his conduct, which was far less egregious than that of plaintiffs, are easily distinguishable and the fact that he was not terminated does not render LSS' proffered explanation for terminating plaintiffs pretext. See (ECF 135-9, pp. 13-14; ECF 172-6, p. 22; ECF 172-16, p. 20; ECF 172-38). Indeed, it is noteworthy that Everett, who had also been suspended for sending sexually explicit emails but, like Conrad, was spared losing his job, was 61 years old at the time. (ECF 135-2, ¶ 13). As such, the favorable treatment of which plaintiffs complain was given to younger employees was also bestowed on at least one person in plaintiffs' protected class.[4]

Plaintiffs also argue that they are able to demonstrate pretext because LSS had subjected

---

3 Although immaterial to the instant discussion, LSS has represented, and plaintiffs do not appear to dispute, that Conrad only sent one email. Conrad, however, testified that he sent three, albeit in one evening. (ECF 172-13, pp. 49, 53, 56, 82).

4 Even Dorsch and Smith, who plaintiffs claim were treated more favorably, were 47 and 46 years old, respectively, and, thus, are in plaintiffs' protected class as well.

them to discriminatory treatment in the past.   To support their argument, plaintiffs, with the exception of Hodczak, have submitted their own deposition testimony in which they complain that Hennessy preferred to surround himself with the younger employees at their weekly supervisory staff meetings, gathering them at the end of the table closest to him and relegating the older supervisors to the far end of the table (ECF 172-1, p. 19); that Litvik and Magdic would routinely be interrupted or talked over during their meetings in an attempt to get rid of older employees and that Hennessy would only listen to the final word of the younger supervisors, making the older supervisors feel useless (ECF 172-1, pp. 20-21, 23; ECF 172-3, p. 5); that when Litvik put Magdic's name down as someone who would be able to succeed him in an emergency situation, Hennessy had him put down a younger person's name (ECF 172-1, p. 25); that Sack once asked Magdic if he was ready to retire and when Magdic said he was not, Sack said, "[W]ell, it looks like you are ready to retire.   You have gray hair and are fat" (ECF 172-3, p. 7); that in 1999, Crossan was removed as a buyer in the purchasing department and transferred to a less desirable position so that "new blood" could be recruited into the department (ECF 172-2, p. 23); and that in 2007, Ron Summerhill who was in his mid-thirties, was recruited from the outside to fill a position as a purchasing manager that had not been posted even though Crossan and another older employee were equally or better qualified (ECF 172-2, pp. 22-23).

Plaintiffs' testimony, however, consists largely of their subjective beliefs and conclusions with little, if any, facts to substantiate those opinions.   To the extent that plaintiffs have pointed to actual record evidence it does not demonstrate past discrimination and is insufficient to create an inference of pretext.   For instance, the fact that Hennessy sat at one end of the table with younger employees and interrupted plaintiffs when they offered comments hardly constitutes discrimination.   Moreover, notwithstanding Litvik's testimony in this regard, Magdic testified

that they could sit wherever they wanted to at the meetings and that they usually sat in the same

spot.   He also allowed that he didn't know why he never changed his seat to sit closer to Hennessy

and that Litvik only moved once to be "silly" and to upset one of the younger employees.   (ECF

181, Exh. 1, pp. 78-80).   In addition, plaintiffs have offered no evidence that they were interrupted

or ignored because of their age or in an attempt to rid the company of older employees but rather

have offered only their own subjective conclusions.

Further, plaintiffs have offered no evidence that Crossan was demoted or was

discriminated against when he was moved from the purchasing department in 1999.   Indeed, not

only have plaintiffs failed to offer any evidence comparing Crossan's salaries or positions but

Crossan himself testified that he was moved to a *supervisory* position covering the warehouse.

(ECF 172-2, p. 23).   His belief that his transfer was to a lesser desirable position designed to force

him to retire or leave the company, is not sufficient.   Moreover, not only was the decision made

eight years earlier by Ron Meyer who had nothing to do with the terminations of plaintiffs'   but

Meyer's alleged decision relayed to Crossan by Gene Zurawsky that he wanted "new blood" in the

department, is not only hearsay and inadmissible, but is not necessarily the equivalent of "young"

blood.   It is just as plausible that changes were being made because employees were bored or

becoming complacent in their positions.   Under these circumstances, no reasonable juror could

find Crossan's transfer discriminatory.

Nor does the fact that Ron Summerhill was recruited from the outside as a purchasing

manager in 2007, evidence past discrimination against Crossan.   Although plaintiffs argue that

Crossan had equal or better qualifications than Summerhill, they have not submitted any evidence

from which it could be determined what criteria LSS was looking for, what Summerhill's

credentials were, or even what Crossan's qualifications were at the time.   As such, plaintiffs'

suggestion that Crossan was discriminated against is without foundation and amounts to nothing more than a challenge to a business decision of LSS. Such challenges, however, are not sufficient to establish pretext. Atkinson v. Lafayette College, 460 F.3d 447, 451 (3d Cir. 2006), quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997) ("The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination]"); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995), quoting McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992) ("we do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere"); Fuentes, 32 F.3d at 764 ("the plaintiff cannot simply show that the employer's business decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent").

Finally, neither Hennessy's insistence that Litvik list someone younger than Magdic as a potential successor nor Sack's inquiry into whether Magdic had any retirement plans provide the requisite evidence to demonstrate that LSS discriminated against plaintiffs in the past. While certainly the words "younger" and "retirement" are evocative, they do not, without more demonstrate age discrimination. Indeed, Sack testified that the age demographics of the work force at LSS is a significant factor and suggested that it is often talked about. He elaborated that in its industry there is a high average age which necessarily means you have "batches of people" retiring so that they have to plan ahead in order to keep the production running (ECF 172-17, p. 18). He also testified that it's more of a seniority issue than an age issue since retirements are based on seniority. Id. Sack further testified that the "rolling mill" where Magdic worked was

reaching a stage where Magdic may not be needed any more and, wanting to place him in another position that would have been more interesting to Magdic and fulfill a need at LSS, wanted to see if Magdic would be interested in taking another assignment.   Without divulging the assignment, because he had not yet discussed the idea with Hennessy or personnel, Sack simply asked Magdic whether he had any plans for retirement.   (ECF 172-17, pp. 22-23).   Absent any evidence that would support a finding that Sack asked Magdic about his retirement and Hennessey instructed Litvik to list a younger person's name was designed to discriminate because of age, plaintiffs have failed to meet their burden or create an issue of fact.   Plaintiffs have pointed to no such evidence and their mere conclusions that comments of Hennessy and Sack evidence discrimination are insufficient.   Plaintiffs have therefore failed to demonstrate that LSS had discriminated against plaintiffs in the past and, thus, have failed to demonstrate that the decision of LSS to terminate plaintiffs' employment because they were sending sexually explicit email was pretext for discrimination.

Plaintiffs also argue that they are able to establish pretext as evidenced by the fact that the November 2007 investigation into Jespersen's claim of sexual harassment and the subsequent probe into the trail of sexually explicit emails discovered as a result, was a sham.   Plaintiffs' arguments lack merit.

In essence, plaintiffs' first argument is that because Jespersen was a "notoriously difficult" employee, who waited three weeks after Magdic sent her the picture of herself to make a complaint, and because the nature of the picture itself was not particularly egregious so as to fall under the definition of sexual harassment, LSS had no reason to investigate Jespersen's complaint in the first instance.   Because an investigation nevertheless took place, plaintiffs simply conclude that it was a sham designed to fire Magdic.   Plaintiffs also argue that the charade of LSS is further

15

evidenced by the fact that Magdic was not given an opportunity to respond to Jespersen's accusations in contravention to Timkens' sexual harassment policy which requires that a "full investigation" be made into complaints of sexual harassment.   <u>See</u> (ECF 172-32).

The difficulty with plaintiffs' arguments, however, is that they overlook the fact that Jespersen's complaint of sexual harassment was not based solely on the email Magdic sent to her with her picture attached.   Rather, Jespersen complained that during the three weeks after she received the email, Magdic made follow-up comments to her such as "I still have your picture," and "It still looks pretty good," or "It still looks pretty nice," and that she felt uncomfortable and intimidated around Magdic and did not want to be alone with him.   (ECF 135-9, pp. 18-19; ECF 135-6, pp. 6, 7).   Indeed, Lawson testified that Jespersen was very agitated and shaking when she made the complaint.   (ECF 135-9, p. 98).   Thus, although Magdic only sent one email containing a relatively benign picture of Jespersen, the basis for the sexual harassment inquiry was also based on the subsequent comments Magdic allegedly made to her.   Not only does this comport with the sexual harassment policy cited by plaintiffs which states that conduct that creates a hostile work environment is regularly exposed to sexual comments or conduct that makes it difficult for an employee to perform his/her job, but Hennessy testified that these were the very type of comments that they "had been trained to look for and to be concerned about sexual harassment in the workplace."   (ECF 172-33; 135-6, p. 7).   LSS therefore not only had a basis to investigate Jespersen's complaint but had a responsibility to do so whether or not she was a difficult employee.   <u>See</u> <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990) (finding that Title VII requires an employer to take prompt action).   The fact that LSS chose to begin its investigation by verifying whether or not Magdic had, in fact, sent the email to Jespersen as she had alleged by examining Magdic's computer is inordinately reasonable and not subject to

16

scrutiny by this Court.[5]   See Atkinson v. Lafayette College, 460 F.3d at 451; Brewer v. Quaker

State Oil Refining Corp., 72 F.3d at 332; Fuentes, 32 F.3d at 764.   See also Geddis v. University

of Delaware, 40 Fed. Appx. 650, 653 (3d Cir. 2002) (finding that an inadequate investigation is not

sufficient to show that the plaintiff was terminated for discriminatory reasons).

At that juncture, having stumbled upon the pornographic emails on Magdic's computer, it

is abundantly clear that the focus of the investigation turned from Jespersen's complaint of sexual

harassment to the exchange of sexually explicit emails amongst LSS employees.   (ECF 172-6, p.

36).   Thus, the fact that Magdic may not have been asked to respond to Jespersen's complaint of

sexual harassment or her allegations that he made harassing comments is immaterial and does not

render LSS' investigation or the reasons for initiating it a sham.   Moreover, as Lawson testified,

had the pornographic emails not been found, the investigation into Jespersen's complaints and

Magdic's alleged comments to her would have proceeded giving Magdic the opportunity to

respond and allowing LSS to determine whether Magdic made any comments at all and, if so,

whether they were sufficiently regular and offensive to constitute sexual harassment.   (ECF

172-6, p. 36).

Finally, and perhaps most importantly, plaintiffs have offered absolutely no evidence

whatsoever that LSS' decision to investigate Jespersen's complaint of sexual harassment was

_____

5 Indeed, it is unlikely that plaintiffs would find it a sham if the investigation into Magdic's emails had exonerated him.   Moreover, Katic's testimony that he would have checked Jespersen's emails is of little significance.   Katic's testimony was that LSS decided to investigate "someone's" emails to determine if it was a legitimate email and that he was asked to access Magdic's computer.   (ECF 172-8, pp. 10, 15).   Having testified that he did not find the email on Magdic's computer (ECF 172-8, p. 10), the inquiry turned to whether or not he had examined Jespersen's computer. Katic's response was that he had not been asked to do so but that would have been the path that he would have taken. (ECF 172-8, p. 15).   This testimony, read in context, suggests only that Katic would have examined Jespersen's computer next having been unable to verify the legitimacy of the email from Magdic's computer.   (ECF 172-8, p. 15). As discussed below, however, the investigation into Jespersen's sexual harassment complaint was all but forgotten when the pornographic emails were discovered on Magdic's computer.   Moreover, how Katic would have conducted the investigation into Jespersen's complaint is immaterial.

17

designed to rid the company of Magdic, and their self-interested interpretation and embellishment of the evidence that is of record is no substitute.

Similarly, plaintiffs have not pointed to any record evidence to support their argument that LSS' subsequent investigation into the exchange of pornographic emails was a sham.   Instead, as before, rather than point to any actual evidence from which a fact finder could find in their favor, plaintiffs ask the Court to accept their interpretation of certain facts which has no support in the record.

Plaintiffs contend that pretext can be gleaned from what they categorize as inconsistencies in LSS' descriptions of its investigation.   The alleged inconsistencies fall into three categories: the emails to which LSS had access when it made the determination to suspend plaintiffs; the factors relied upon by LSS is assessing the appropriate discipline for each of the six employees found to have violated the EC policy; and LSS' reasons for terminating plaintiffs.

With respect to the first set of "inconsistencies," plaintiffs initially argue that Lawson's assertion that Katic's search of Magdic's emails on October 29, 2007, led directly to the discovery of the sexually oriented emails at issue is inconsistent not only with Lawson's testimony that Katic reported to her that Magdic regularly cleaned out his emails so that nothing was in his "sent" file but with the fact that, as of October 29, 2010, no sexually oriented materials were in the PST file created by Katic to identify emails unrelated to the manufacturing of steel.   (ECF 170, pp. 40-41). Review of the record, however, shows that although Katic did report to Lawson that Magdic's "sent" file was "very clean" as though he cleaned it out on a daily basis, plaintiffs have not pointed to any evidence that Katic's search was confined to Magdic's "sent" file.   Indeed, Katic testified that he believed he found the photograph of Jespersen in Magdic's "My Documents" file or somewhere else rather obvious.   (ECF 172-8, p. 10).   Thus, there is nothing inconsistent about

Magdic's clean "sent" file and the discovery of sexually explicit emails on his computer.

Moreover, plaintiffs' suggestion that, because there are no sexually oriented materials in Katic's PST file as of October 29, 2007, no sexually explicit emails had actually been found on Magdic's computer on that date is also without merit. As pointed out by LSS, it has never claimed that all the emails which prompted the investigation or which provided the basis for terminating plaintiffs' employment were contained on Katic's PST file and plaintiffs have not provided any support for that assumption. Indeed, it is undisputed that Katic was only involved in the investigation for two days before he took leave for the birth of his child and that the probe into plaintiffs emails continued for another three days. (ECF 172-8, pp. 31-2, 72). As well, plaintiffs have acknowledged that LSS watched the email traffic for the week, from the Monday Jespersen made the complaint against Magdic until the Friday plaintiffs were suspended. (ECF 171, ¶ 193). Lawson also testified that during that five day period anywhere from two to six sexually explicit emails were being traded on a daily basis. (ECF 172-6, p. 37). As such, there were clearly more emails available to LSS when it made the decision to terminate plaintiffs than that which appears on Katic's PST file and plaintiffs' observations concerning LSS' use of the emails, see ECF 170, pp. 44-46, which largely compares what was or was not found on Katic's PST file does not provide the basis for finding that LSS' articulated reasons for terminating plaintiffs' employment was pretext.

Plaintiffs also cite to the fact that the emails submitted by LSS to the EEOC, the emails found on the PST file created by Katic, and the emails submitted in conjunction with its motion are not identical. Plaintiffs argue that these differences evidence a "shifting and/or swelling" of the emails relied upon by LSS, many of which, plaintiffs contend, could not have been available to LSS at the time plaintiffs were terminated.

Significantly, plaintiffs do not specifically identify which emails could not have been available to LSS when it terminated plaintiffs employment or suggest why they could not have been available other than to point out that some of the emails relied upon by LSS were not sent during the time covered by the investigation. When the emails were sent, however, is immaterial. What is at issue is whether they were found on plaintiffs' computers during the course of LSS' investigation. Plaintiffs have not pointed to any evidence that the emails submitted to the EEOC or to this Court were not discovered during the week of October 29th to November 2nd, 2007. Indeed, all of the emails submitted, both to the EEOC and to this Court, were sent either on November 2, 2007, or in the preceding weeks or months. See (ECF 135-1; ECF 135-3; ECF 135-4; ECF 135-5; ECF 172-63; ECF 172-64; ECF 172-65; ECF 172-66).

Further, the fact that the emails submitted to the EEOC are different than those submitted here fails to demonstrate pretext. Just as LSS has never suggested that every document it reviewed or relied upon could be found in Katic's PST file, there is no evidence that it submitted to the EEOC every document found during its investigation. Indeed, review of LSS' position statements submitted to the EEOC show that LSS submitted only "samples" of the emails found on plaintiffs' computers. (ECF 172-63, p. 5; ECF 172-64, p. 4; ECF 172-65, p. 5; ECF 172-66, p. 5). Thus, plaintiffs' particular observations about the emails submitted by LSS to the EEOC and those submitted here are immaterial.[6]

Next plaintiffs argue that there are inconsistencies in the evidence regarding the criteria that LSS used to determine what discipline would be imposed on the six suspended employees and

---

[6] Plaintiffs' other observation that some of the emails submitted to the EEOC "are not even arguable pornographic" is immaterial as well, as some of the emails found during the investigation were submitted to the EEOC because of their defamatory nature. More importantly, however, the documents LSS submitted to the EEOC, contain a plethora of sexually explicit and pornographic photographs attached to emails sent between October 5, 2007 and November 2, 2007. (ECF 172-63; ECF 172-64; ECF 172-65; ECF 172-66).

that these alleged discrepancies could easily support a finding that the process was a mere contrivance. Specifically, plaintiffs cite to Lawson's deposition testimony, taken in December of 2009, in which she stated that the factors they considered were: who the emails were sent to; the nature of the emails; the number of emails; whether they were sent to individuals inside the company or outside; and whether they were sent to customers or vendors. (ECF 172-6, pp. 22). Plaintiffs next point to the LSS' EEOC submissions in which Daniel DePuydt, Esquire, LSS' then in-house counsel, stated that they evaluated to whom the emails were sent; the extent to which the employees actions constituted a misuse of company equipment and time; the creation of a hostile work environment for co-workers; and the presence of defamatory emails. (ECF 172-63, p. 4; ECF 172-64, p. 3; ECF 172-65, p. 4; ECF 172-66, p. 4). In LSS' present brief, they have listed the criteria used as follows: whether the employee was in a management position; the quantity and nature of the emails; prior discipline for sending inappropriate emails; whether the conduct occurred during their suspension; and the supervisor/subordinate relationship between Litvik and Conrad; whether the emails were sent during work time using LSS' work email address; and whether the emails were sent to personal or business contacts. (ECF 134, p. 8). And lastly, plaintiffs point to a chart that Lawson and Hennessy created during their discussions in which the categories "Sexual Harassment," "Internal," "External," and "Hard Drive" are listed (ECF 172-38). Because these various descriptions of the factors considered are not identical plaintiffs contend that a jury could reasonably find that the factors somehow evolved so as to justify terminating plaintiffs. Plaintiffs' argument is unpersuasive.

First, the Court does not find that the various recitations of the factors considered to determine the appropriate discipline are as inconsistent as plaintiffs have suggested. First, it appears clear from the record as a whole that the chart created by Hennessy and Lawson, which

plaintiffs agree was created contemporaneously with the events at issue, did not serve to memorialize the many conversations regarding the events in question or the discipline being contemplated but rather was merely a discussion tool. (ECF 172-6, pp. 21-23, 40). Moreover, both Lawson's testimony and that of Hennessy, ECF 172-16, pp. 19-20, 26, regarding the criteria they discussed is perfectly consistent with the factors listed on the chart.

Lawson's testimony that they considered who the emails were sent to, whether they were sent inside or outside the company or to vendors and customers is certainly consistent with whether they were "Internal" or "External."[7] Moreover, the chart also references that Everett and Conrad sent messages from "home only." The fact that Lawson, in her deposition, did not include "sexual harassment" and "hard drive" as factors they considered, which occurred over two years after the events in question, does not render her testimony inconsistent. Although plaintiffs have argued that because Magdic was the only person accused of sexual harassment and only Magdic and Hodczak's hard drives were examined, these categories are somehow misleading, it does not negate the fact those issues were factors discussed nor does it evidence inconsistencies.

Nor does the Court find Mr. DePuydt's description of the factors considered in the position statements sent to the EEOC inconsistent with either Lawson's testimony or the chart. Indeed, the position statements reflect that many factors were considered which included, but were not necessarily limited to, to whom the emails were sent; the extent to which the employees' actions constituted a misuse of company equipment and time; the creation of a hostile work environment for co-workers; and the presence of defamatory emails. Whether emails were sent internally,

---

7 Plaintiffs do not dispute that the nature of the emails and the quantity of the emails were factors considered except to note that the email that stood out to Hennessey as having the worst content was sent by Conrad who was not terminated and that Lawson admitted that neither she nor Hennessey assessed how much time was spent sending the emails. Hennessy's testimony, however, was that the email sent by Conrad was *amongst* the most extreme (ECF 172-16, p. 29), and the fact that the amount of time spent sending the emails was not assessed does not negate that the quantity of emails sent was a factor.

externally, to vendor or customers, and how many emails were sent is encompassed under how much company time and equipment was misused. The fact that the precise wording was not used in LSS' submission to the EEOC does not render the factors as being inconsistent.

Finally, plaintiffs take issue with LSS' list of factors set forth in its brief. Of the eight factors listed only two have not been previously mentioned: the fact that Hodczak had previously received a warning from his supervisor about viewing sexually explicit emails and that Crossan had sent a sexually explicit email to Magdic after he had been suspended. Plaintiffs take issue with these criteria because Hodczak denies he had been reprimanded and Crossan denies that he sent the email to Magdic after he had been suspended. Neither of these contentions, however, provides evidence that these factors were not considered or discussed by LSS' decision makers or even that they are inconsistent with the other factors listed.[8] Under these circumstances, the Court finds that no reasonable jury could conclude that the whole process of determining the appropriate discipline was a mere contrivance in order to get rid of older employees.

Lastly, plaintiffs argue that, despite LSS' contention that plaintiffs were fired solely for sending sexually explicit emails, it represented to the EEOC that, in addition to sending the pornographic emails, they also "authored numerous defamatory emails targeting peers and managers at [LSS]."[9] (ECF 172-63, p. 5; ECF 172-64, p. 4; ECF 172-65, p. 5). Noting that LSS now seems to have abandoned this alternative justification for terminating their employment, plaintiffs argue that a jury might well find reason to doubt LSS' reasons for its employment decisions. The Court disagrees.

---

8 Interestingly, Hodczak does not deny that his supervisor found him viewing sexually explicit emails and Crossan does not dispute that he sent the email in question to Magdic on the day he was suspended.

9 Contrary to plaintiffs' assertion this language does not appear in the position statement filed in response to Crossan's EEOC charge. (ECF 172-66, p. 3-6).

Review of the EEOC position papers filed by LSS as a whole clearly demonstrates that the LSS stated reason for terminating plaintiffs' employment was because they had been sending pornographic emails. (ECF 172-63, pp. 4-7; ECF 172-64, pp. 3-5; ECF 172-65, pp. 4-6]. The fact that LSS included information that defamatory emails had also been sent does not alter the basic stated reason. Because no alternative justification for its decisions was proffered by LSS, there is no basis upon which a jury could find a shift in its explanations or have reason to doubt the basic reason LSS has proffered.

Plaintiffs also attempt to demonstrate pretext by taking issue with LSS' investigation, arguing that because LSS only examined the "sent" emails, the results were artificial and misleading and that, had LSS conducted a more thorough investigation, they would have found that the conduct for which plaintiffs were fired was commonplace at LSS. To support their position, plaintiffs have proffered the affidavit of W. Scott Ardisson, a certified computer examiner and President and Chief Technical Officer of bit-x-bit, LLC, a computer forensic and electronic discovery consulting firm, who, after examining the emails produced by LSS during discovery in this case, identified nine emails that had been sent and/or received by LSS employees during the relevant time frame which purport to be of the same nature as those sent by plaintiffs. (ECF 172- 22, ¶ 3). Plaintiffs also argue that as a result of Ardisson's examination of emails "received" as well as those "sent" it was revealed that over twenty LSS employees were sending non-compliant emails from their LSS accounts. See (ECF 172-22, Exh. A).

Notwithstanding the fact that none of the emails purportedly found by Mr. Ardisson have been produced or identified, the gist of his affidavit and plaintiffs' argument is that the investigation conducted by LSS was not extensive enough. As previously discussed, however,

the issue is not whether LSS was competent in its investigation or whether they made the right decision, but whether it was motivated by a discriminatory animus.   Geddis v. University of Delaware, 40 Fed. Appx. at 653 (allegations of an inadequate investigation are not sufficient to show an employer acted with discriminatory animus); Kariotis v. Navistar Int'l Trans. Corp., 131 F.3d 672, 677 (7th Cir. 1997) (declining to find pretext based on plaintiffs' argument that the defendant was careless in not checking its facts before terminating her).   See Atkinson v. Lafayette College, 460 F.3d at 451; Brewer v. Quaker State Oil Refining Corp., 72 F.3d at 332; Fuentes, 32 F.3d at 765.   Nothing about Mr. Ardisson's criticism of the LSS investigation suggests that it was designed to discriminate.   Indeed, the fact that Mr. Ardisson used a different approach at the request and direction of counsel for the plaintiffs and examined "received" emails in addition to "sent" emails does not render the decision of LSS to focus on "sent" emails discriminatory.   Indeed, Lawson and Katic testified that they focused on "sent" emails because a person is unable to control what they receive.   (ECF 172-6, pp. 19, 48; ECF 172-8, pp. 12, 31). Moreover, neither Ardisson nor plaintiffs have produced any evidence that the emails referenced by Ardisson were sent to or received by plaintiffs during the investigation period, that LSS was aware of them but chose to ignore them, or even that LSS should have found them given the parameters of it's investigation.   Under these circumstances, Mr. Ardisson's affidavit does not provide a basis for finding pretext.

     In an effort to support their argument that sending sexually explicit emails was so commonplace at LSS that sending pornographic emails could not be the real reason plaintiffs were terminated, plaintiffs have also submitted a declaration from their attorney, in which he states that 90 % of the email mailboxes searched during discovery in this case contained emails that reflected either a keyword search term or an image that was listed in the parties' agreed upon ESI

protocol.  (ECF 172-68).  Plaintiffs' argument, however, is misleading.

While it may be that 186 of the 206 mailboxes contained a keyword, the vast majority of the emails which contained a keyword were "false hits."   For instance, as argued by LSS, "balls" was one of the keywords selected by plaintiffs for the protocol.   Because LSS manufactures "steel balls," every email referencing "steel balls" registered as a hit.   Those emails, however, do not provide the basis for finding that sending sexually explicit emails was commonplace at LSS.   To the contrary, LSS has represented, and plaintiffs do not dispute, that the search of the 206 mailboxes, which contained 400,000 documents, revealed 10,811 documents -- or 2.7% -- that contained either a keyword or an image as defined in the protocol.  (ECF 135-10, ¶¶ 2-4).   Of those 10,811 documents, all but 859 emails were false hits or otherwise nonexplicit.  *Id.* at ¶¶ 7-9. Thus, out of 400,000 documents reviewed, only .2% contained sexually oriented material which hardly supports a finding that sending sexually explicit emails was commonplace at LSS.

Moreover, the fact that plaintiff's counsel has identified certain emails found on the backup server that would have been "connected to" some of the emails sent by plaintiffs in this case is of no moment.   Plaintiffs have offered no evidence that those emails were found or should have been found during LSS' investigation or that the decision makers in this case were aware of, or should have been aware of the emails which he identified.   In fact, it is clear that LSS was not aware of such emails and had no reason to be since they were discovered only as a result of accessing the backup copy of LSS' 32.1 GB email server during discovery in this case.   The fact that LSS did not engage in such an extensive review of electronically stored information during the investigation is immaterial.   See Atkinson v. Lafayette College, 460 F.3d at 451; Brewer v.

<u>Quaker State Oil Refining Corp.</u>, 72 F.3d at 332; <u>Fuentes</u>, 32 F.3d at 765.[10]

Finally, plaintiffs argue that they are able to demonstrate that LSS' reason for terminating their employment is pretext for age discrimination because LSS has repeatedly subjected other employees to discriminatory treatment. Plaintiffs base their argument on several remarks made by Sack and Hennessy, a series of age discrimination suits filed against Latrobe Steel in the 90's, and their perception that LSS has a pattern of firing older employees and replacing them with younger employees.

Specifically, plaintiffs contend that Sack led a discussion during a 2007 management meeting in which he commented about the need to obtain a younger work force, and that upon seeing a woman, who was in her late fifties, operating a high-lift remarked that "whenever that 60-year-old woman has a Workers' Comp injury, I'm going to fire the person that hired her." As well, plaintiffs contend that Hennessy stated at a staff meeting that he couldn't wait for Steve Sansig and Brian Trice, who were both in their late fifties, to retire so that he could hire some younger people who would have better hand-eye coordination to operate the Mesta press. LSS contends that these are nothing more than stray remarks and are not probative of an intent to discriminate.

As this Court has previously stated, statements or comments by others in the workplace may demonstrate discriminatory intent requiring the court to distinguish between those statements that are truly evidence of the employer's intent and those that are merely "stray remarks." <u>Lloyd</u>

---

10 Similarly immaterial is the deposition testimony of Gene Zurawsky who had been the Human Resources Director at LSS up until September 20, 2007. Mr. Zurawsky's opinion that the investigation was not handled fairly or consistently and that he didn't agree with the decision to terminate plaintiffs is not particularly significant in light of his other testimony that he had no role in the investigation and that he didn't know if the emails at issue in past situations were like those being transmitted by plaintiffs. (ECF 172-5, pp. 14, 19, 22). Moreover, while Zurawsky may not have agreed with the decision because there was no precedent for it, he never suggested that age was a factor in LSS' decision or even that he believed it was a consideration. (ECF 172-5).

v. Washington & Jefferson College, 2007 WL 1575448 at *20 (W.D. Pa. May 30, 2007), aff'd, 288 Fed. Appx. 786 (3d Cir. 2008), citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989). In order to differentiate, the following factors have been utilized: (1) who made the remark, i.e., a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decision-making process.   Id., citing Pronin v. Raffi Custom Photo Lab., Inc., 383 F. Supp. 2d 628, 637-38 (S.D.N.Y. 2005).   Further, "stray remarks by decision makers, unrelated to the decision-making process, are rarely given weight, particularly if they are made temporally remote from the date of the decision.   Silver v. American Inst. of Certified Public Accountants, 212 Fed. Appx. 82, 85 (3d Cir. 2006), citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992).

Here, although Sack and Hennessy are both supervisors and involved in the decision to terminate plaintiffs' employment, none of the remarks cited by plaintiffs were made in relation to that decision.   Moreover, plaintiffs have not pointed to any evidence from which it can be determined when these comments were made.   At best, the evidence shows that Sack's comment about needing a younger work force was made during the succession from Timken to LSS which occurred in 2006 and remote in time from the decision to terminate plaintiffs.   It is even less clear when Sack allegedly made the remark about firing the person who hired the high-lift operator and the only evidence regarding the comment attributed to Hennessy was that it was made sometime in 2007.

In addition, the evidence reflects that the comment attributed to Sack regarding the need for a younger workforce, if it was made at all, was said during a discussion about age demographics of

the work force at LSS. As previously discussed, Sack testified that age demographics was often discussed given the high average age of workers in their industry which necessarily means you have "batches of people" retiring and need to plan ahead in order to keep the production running (ECF 172-17, p. 18). Under these circumstances, a reasonable juror could not find the remark discriminatory. Nor has plaintiff presented any evidence to establish the context in which Hennessy's comment was made or from which it could reasonably be concluded that the remark was discriminatory. It is equally plausible that hand-eye coordination, which cannot be disputed to diminish with age, is important in operating a Mesta press and that Sansig and Trice had demonstrated some difficulty in that regard. Under those circumstances, Hennessy's comment is not indicative of age bias. As such, the Court finds that the statements cited by plaintiffs as evidencing a discriminatory attitude are nothing more than stray remarks and do not provide the basis for finding pretext.

Nor does the Court find the fact that five age discrimination suits had been filed in 1994 and 1995 against LLS' predecessor, Latrobe Steel, probative of LSS' reasons for terminating plaintiffs' employment in 2007. Not only are the lawsuits cited by plaintiffs too remote in time but not a single decision maker in this case is mentioned in those actions. (ECF 172-45 through ECF 172-49). See Waldron v. SL Industries, Inc., 849 F. Supp. 996, 1008 (D.N.J. 1994), rev'd on other grounds, 56 F.3d 491 (3d Cir. 1995) (finding that the plaintiff's reliance on a prior age discrimination suit filed against the employer's parent company five years before plaintiff was terminated was misplaced). Moreover, all five of those lawsuits arise out of a single decision made by Latrobe Steel to implement a reduction in force. (ECF 172-45 through ECF 172-49).

Lastly plaintiffs argue that pretext may be inferred because LSS has a pattern of terminating older employees and replacing them with younger workers. Plaintiffs point to three

employees who were either fired or, allegedly, forced to retire. They have not, however, provided any evidence that two of these employees were replaced by anyone at all much less by someone younger. Moreover, the two employees that were terminated were in November of 2002 and October of 2001, five and six years before plaintiffs were fired; plaintiffs have not shared with the Court when the third retired. Further, although in the affidavits submitted by plaintiffs they are careful to include assertions that "the present management of LSS is largely the same" as the management of Timken when the adverse actions allegedly took place, they fall short of identifying who the actual decision makers were. Under these circumstances, plaintiffs have failed to demonstrate that LSS has a pattern of terminating older employees and replacing them with younger employees or that LSS' stated reasons for terminating plaintiffs' employment is pretextual.

In summary, plaintiffs have failed to demonstrate that "but for" their ages, LSS would not have terminated their employment for sending sexually explicit and pornographic emails. Despite the numerous arguments advanced by plaintiffs, they have attempted to create issues where none exist by making assumptions and offering interpretations of certain occurrences without providing the necessary and appropriate factual support. Moreover, plaintiffs have admitted that they sent the emails in question and cannot dispute that doing so violated the LSS EC Policy. In addition, while not dispositive, it is worth noting that all four plaintiffs were hired by LSS less than one year before they were terminated, at 56, 57, 58 and 59 years of age, and that Hodczak was awarded a promotion only six weeks before the events at issue took place. (ECF 17, ¶ 6; ECF 21, ¶¶ 3-5, 8-10; ECF 26, ¶¶ 3-5; ECF 27, ¶ 6). These facts, coupled with the fact that Everett, who was 61 years old at the time and thus older than plaintiffs, was not terminated, simply

do not suggest that LSS acted out of a discriminatory animus.[11]

        D.      <u>Conclusion</u>

For the hereinabove states reasons, Defendant's Motion for Summary Judgment (ECF 132)

is GRANTED.   A separate order follows.

/s/ Terrence F. McVerry         
United States District Judge

Date: 29 December, 2010

cc:      Bruce C. Fox, Esquire
        Email: bruce.fox@obermayer.com
        Melissa L. Evans, Esquire
        Email: melissa.evans@obermayer.com

        Thomas S. Giotto, Esquire
        Email: thomas.giotto@bipc.com
        Jaime S. Tuite, Esquire
        Email: Jaime.Tuite@bipc.com
        Joseph F. Quinn, Esquire
        Email: joseph.quinn@bipc.com
        Erin J. McLaughlin, Esquire
        Email: erin.mclaughlin@bipc.com
        Mark R. Hornak, Esquire
        Email: mark.hornak@bipc.com

---

11 Having found that plaintiffs are unable to meet their burden of demonstrating pretext, the Court need not address the argument of LSS that Hodczak is unable to demonstrate a *prima facie* case of discrimination in the first instance.